IGNATZ H. ROSENFELD, as Administrator, etc., of LESLIE
ROSENFELD, Deceased, Respondent, *v.* ALBERT SMITH &
SON, INC., Appellant, Impleaded with CAFE BOULEVARD
and Others, Defendants.

First Department, December 21, 1917.

Negligence — liability of defendant for negligence in improperly
placing tubes in steam boiler — evidence — effect of tests of
boiler — steam boiler inherently dangerous — duty of one making
repairs to avoid injury to persons and property.

In an action to recover for death alleged to have been caused by the negli-
gence of the defendants in improperly installing new tubes in a steam
boiler, which thereafter leaked and emitted steam, resulting in the death
of plaintiff's intestate, the legitimate and only effect of evidence as to
tests made of the boiler was the bearing upon the question as to whether
or not defendant properly performed its contract, or, in other words,
whether or not it was guilty of negligence, where the contention that the
boiler was in use by the purchaser after it had been tested and accepted
was not raised at the trial.

As the evidence established that the defendant negligently performed
the work of repairing the boiler, it cannot be relieved of the consequences
thereof without a proper test showing that notwithstanding its negli-
gence, the boiler was safe for the use intended.

The defendant was chargeable with notice of the fact that the tubes were
not merely intended as conduits for heating, but that they were intended
to support and sustain the boiler heads. It was also chargeable with
knowledge of the dangers to those lawfully on the premises in the event
that the boiler head gave way, owing to its negligence in making the
repairs.

A steam boiler is inherently dangerous, and one who repairs it owes a duty
of proper care to avoid injury, not only to the property and employees
of the purchaser, but to all persons who may be thereby subjected to
injury and to that end must perform his work properly.

APPEAL by the defendant, Albert Smith & Son, Inc., from
a judgment of the Supreme Court in favor of the plaintiff,
entered in the office of the clerk of the county of New York
on the 5th day of March, 1917, upon the verdict of a jury
for $9,000, reduced by consent to $7,250, and also from an
order entered in said clerk's office on the 26th day of February,
1917, denying appellant's motion for a new trial made upon
the minutes.

*James B. Henney* of counsel [*Owen F. Hughes* with him on the brief], for the appellant.

*Saul Bernstein* of counsel [*Marcus Schnitzer*, attorney], for the respondent.

LAUGHLIN, J.:

This is a statutory action to recover for the death of Leslie Rosenfeld, alleged to have been caused by the negligence of the defendants.

The defendant Forty-first Street Realty Company was the owner in fee of part of the premises at the southeasterly corner of Broadway and Forty-first street, in the borough of Manhattan, New York, and was the lessee of the remaining part of said premises upon which there were twelve-story buildings with a basement and sub-basement. In the sub-basement there were stationary engines and boilers for the generation and supplying of heat, light and power for the occupants of the buildings. On the 20th day of February, 1913, said company leased the restaurant, rathskellar, bar-room and four living rooms and that part of the basement and sub-basement in which the boilers and engines were located to the Cafe Boulevard Company, a domestic corporation. The Hotel Louvre Company used and occupied the upper floors of the buildings as a hotel under a lease from the owner. One Duncan was its president.

In an action to foreclose a mortgage on the premises the defendant Carpenter was on the 29th of April, 1914, appointed receiver of the rents. Prior to the trial of the action the plaintiff received from the defendants other than the appellant the sum of $1,750 in settlement of the cause of action against them, and the action was discontinued as to them without prejudice as to its continuance against the appellant.

There was a controversy between the owner and the tenants concerning the state of repair of the power plant, and on the 28th of September, 1914, the appellant entered into a contract with the Hotel Louvre Company for repairing the boilers. The contract is evidenced by a proposal in writing in the form of a letter from the appellant to Duncan and by a letter from the Hotel Louvre Company accepting it. The appellant thereby contracted to repair the two boilers by cutting out,

removing and carting away from each, one hundred and eight tubes and by replacing them with one hundred and eight new three and one-half inch steel tubes twelve feet and six inches long in each boiler, and it agreed to do the work " in a first class workmanlike manner and to be perfectly tight when completed." The appellant undertook to perform the contract and removed the old tubes which were then in the boiler and installed new tubes in boiler No. 2, which is the one in question in this litigation. The negligence with which the appellant is charged and for which it has been held liable is in not performing the work in a first-class workmanlike manner.

The boiler was twelve feet five and five-eighths inches in length and nine and one-half feet in diameter. It was cylindrical in form and the shell longitudinally consisted of steel plates twenty-three thirty-seconds of an inch in thickness, and the front and rear heads of the boiler were flat and made of steel five-eighths of an inch in thickness. These boiler heads were held in place and secured by bracing rods two and one-quarter inches in diameter running through the boiler and boiler heads and secured on the outside by nuts. These stays were within the boiler but outside the space occupied by the boiler tubes which the appellant was employed to install, and the plan of construction contemplated that the boiler heads opposite the spaces occupied by such tubes should be sustained against the internal pressure of the steam by having the tubes at either end securely held in the boiler heads. The holes through the boiler heads into which the tubes were inserted were three and nine-sixteenths inches in diameter. The standard tubes nearest that diameter were three and one-half inches in diameter as called for by the contract. There would, therefore, be a space of one-thirty-second of an inch all around between the ends of the tubes and the inner surface of the boiler heads through which they passed. There are two methods by which such space is taken up. One, known as " beading," consists in spreading the projecting ends of the tubes and then hammering them back flat and tight against the boiler heads. This method was not employed and no negligence was chargeable to the appellant in that regard for it appears that the method which the appellant attempted to follow, if not better, at least would

have sufficed had the work been properly done. The appellant inserted the tubes which projected about one-eighth of an inch outside the boiler heads at either end. With the tubes thus resting on the lower part of the holes through the boiler heads, it inserted pieces of hoop iron one-thirty-second of an inch in thickness, known as " shims," in the opening above the tubes, but instead of having the shims continue all the way around which would have filled the space it only inserted them about half way around; and then tapered or scarfed down the ends so that they gradually became thinner and thinner. Appellant's explanation for not putting the shims all the way around is that the holes varied in diameter to some extent and that the ends could not have been brought together or have been overlapped so as to make a tight connection. The shims thus inserted were *flush* with the outer sides of the boiler heads and did not project beyond as did the tubes. The tubes were a little over one-eighth of an inch in thickness, and their ends were then rolled and expanded by an appliance known as a Dudgeon expander until the tube ends expanded, in part, against the shims pressing them against the edges of the holes, and the ends of the tubes were flared outward to some extent. The object of this is to make the boiler water-tight and to prevent the boiler heads from being bulged out and pulling away from the ends of the tubes by the pressure from within.

Evidence was given on the part of the plaintiff tending to show that the shims should have extended all the way around and that they should have projected beyond the boiler heads and have been flared with the tube ends so that they would tend to resist the pressure from within and prevent the bulging out of the boiler heads in a manner to cause an opening or leak. It was found after the accident that the rear boiler head had bulged out on a vertical line three-fourths of an inch, the result of which was that twenty-seven of the tubes in the center dropped inside the boiler and the other tubes were left barely holding. Outside this boiler head was a combustion chamber with a door opening into it from the engine room. After the accident the door was found open and it has been assumed and is to be inferred that the steam, water, gas and smoke came into the engine room through the

opening caused by the bulging of the boiler head in the manner described, and through the combustion chamber and door. There was no explosion in a strict sense. The boiler did not blow up; and this was the only defect found after the accident. Lansu, the assistant engineer who was on duty that night, testified that five or six minutes before the accident he noticed the steam gauge on the boiler and it registered a pressure of ninety-seven pounds and that about two minutes before the accident he noticed the steam gauge on the ice machine which registered ninety-five pounds, indicating a pressure at the boiler of ninety-seven pounds as there was a difference of two pounds between the two gauges, and that two minutes thereafter, he heard a noise in the boiler room as if the fireman were blowing water through, " blowing the dirt out of the water gauge;" and he then went over to the boiler and found the boiler room filled with steam and water and smoke and that he tried to run away but that " the steam " knocked him down. The effect of his testimony is that down to the time he heard the sound as if the fireman were blowing the dirt out of the water gauge everything was apparently in order and working properly.

The decedent, who was eighteen years of age and was accustomed to work about the premises for the Cafe Boulevard, of which his father was president, after school hours, was in the vicinity of the boiler room at the time and sustained injuries from which he died. It was neither shown nor claimed that he was guilty of contributory negligence.

In that type of engine and boiler the furnace is under the boiler and constitutes part of it, and the whole structure rests on the ground. The firebox is toward the front end of the boiler and from it the heat passes over a wall under the boiler into the combustion chamber at the back end of the boiler and from there through the tubes and out of the smokestack at the other end known as the front end.

The contract contained no provision with respect to testing the work either before or after acceptance. After the appellant claimed to have completed its work the boiler was tested on the seventeenth of October under the supervision of an inspector of the Hartford Steam Boiler Inspection Company which is a boiler insurance company. The pur-

pose for which the test was made was not shown, but it is to be inferred that it was made by the insurance company with a view to insuring the boiler. For the purpose of making this test the safety valve on the top of the boiler was securely fastened. The boiler was then subjected to a hydrostatic pressure of 190 pounds per square inch by pumping cold water into it. The boiler was designed to carry a normal pressure of 125 pounds per square inch with a factor of safety of five; in other words, it was intended to withstand a pressure of 625 pounds per square inch from within. One Teitman was in charge of the operation of the engines and boilers with Lansu as assistant engineer. Both were in the joint employ of the Hotel Louvre Company and the Cafe Boulevard Company. Teitman assisted in making the test which disclosed that seventeen tubes at the front end of the boiler were leaking and sweating and twelve at the back end. The inspector marked them with chalk and directed Teitman to have the appellant return and reroll those tubes and then to apply another test " and when everything was tight, to start up his boiler." Appellant was notified and its foreman returned and rerolled the ends of the tubes which had been marked. Thereupon appellant's foreman and his assistant and Teitman conducted another hydrostatic cold water test. Appellant's foreman testified that a pressure of 50 pounds per square inch was first applied and he then looked over the work and found no leak; that then 100 pounds pressure was applied with like result; and then 160 pounds pressure was applied and no defect was discovered. Teitman testified that the final pressure applied in that test was 190 pounds and that this indicated that all the tubes were perfectly tight and that there was no leak, and that he informed appellant's foreman that he was satisfied with the test and the latter departed. The prop which was used to secure the safety valve was then released and the boiler was put in operation. The accident occurred within ten days thereafter. The engineer testified that after steam had been generated and the boiler had been put in operation and about seven days before the accident he noticed a leak at about the center of the boiler head at the end of the tubes but that this disappeared when the heat increased, and he

did not call the appellant's attention to it. The night before the accident Lansu, in looking through over the fire bed from in front of the boiler, observed that water was dripping down in the rear and that the next morning he reported this to Teitman, and also called the decedent's father down to look at it, but that when decedent's father came down and they looked at it the dripping of the water had ceased owing to the fact that the fire was hotter and had dried it up. One Smith, an officer of the appellant, testified that at noon on the day of the accident he was sent to the premises pursuant to a telephone call which it had received, and was informed by Teitman that some of the tubes in the rear of the boiler head leaked; that he offered to repair them if Teitman would shut down, as repairs could not be made while the boiler was in operation; but that Teitman answered that he could not shut down as this was the only boiler supplying light, heat and power. Teitman, however, denied this and testified in effect that he did not communicate with appellant or have any interview with Smith on that day. Teitman, who was called as a witness for the plaintiff, on his redirect examination testified that there was a bad leak the third day after they started to operate the boiler and that he put some fine grain oatmeal into the water as a temporary method of repairing the leak; but he subsequently said that he had made a mistake in so testifying and that he did not at any time prior to the accident put any meal in the water. After the accident the safety valve was found blocked so that it could not operate, but since it was not intended to operate until there was a steam pressure of 125 pounds to the square inch that would not contribute to the accident if the testimony of Lansu, who was called by the plaintiff, with respect to the steam pressure was at all accurate. There was also evidence tending to show that an excessive amount of oil was improperly permitted to pass back into the boiler in the water which returned through the pipes to the boiler, but there was a conflict in the evidence on that point. On the part of the appellant evidence was offered tending to show that the presence of oil in the water in the boiler would be a competent producing cause of the accident; and that the work performed by the appellant was properly done. The theory with respect to the effect of the

presence of an excessive amount of oil in the boiler as given by witnesses in behalf of the appellant is that it would accumulate on the tubes and prevent the water from cooling them and cause them to soften and pull away from the boiler heads. In behalf of the plaintiff several expert witnesses testified in answer to hypothetical questions assuming the material facts claimed by plaintiff to have been established by the evidence and with respect to the construction of the boiler and the manner in which it had been repaired by the appellant and was operated, that the failure of the appellant to properly shim the openings around the ends of the tubes and to flare the shims as well as the ends of the tubes was a competent producing cause of the bulging of the boiler heads without which the accident would not have happened.

The case was submitted to the jury on the theory that it presented a question of fact for their determination as to whether the appellant repaired the boiler in a good and workmanlike manner, and whether its failure so to repair it was the cause of the accident; and the jury were clearly and carefully instructed that the only ground upon which the defendant could be held liable was negligence in making the repairs, without which negligence the accident would not have happened. The jury were also instructed that if the appellant was negligent in performing its work under the contract and the accident *could* not have happened if it had performed its work properly, then the defendant was liable even though there was also negligence on the part of the others " in connection with the operation of the boiler or otherwise; " and no exception was taken to this charge. No question was submitted to the jury with respect to the tests made before or after the boiler was put in operation and there was no request that any question in that regard be left to the jury or for instructions with respect thereto.

It is contended in behalf of the appellant that it is not liable even if it were negligent in making the repairs inasmuch as the boiler was in use by the purchaser after it had been tested and accepted. This contention is based on the action of Teitman in stating that the second test was satisfactory. There is, however, no evidence that Teitman was authorized to waive any defect of workmanship or to accept the test as

satisfactory in behalf of the purchaser. He was merely there as an engineer to operate the boilers and engines under the joint employment of two of the tenants, and he assisted in making the tests. The appellant relies, in support of this contention, on *Losee* v. *Clute* (51 N. Y. 494) and *MacPherson* v. *Buick Motor Co.* (217 id. 382). The *Losee* case was an action against the manufacturer of a steam boiler for damages caused to the property of the plaintiff on premises adjoining those on which the boiler was in use, caused by the explosion of the boiler, and it was brought on the theory that the boiler was constructed improperly and of poor material. The evidence showed that the boiler was tested by the purchaser to its satisfaction and accepted and was thereafter used for a period of about three months before the explosion occurred. That decision has been distinguished by the Court of Appeals in *MacPherson* v. *Buick Motor Co.* (*supra*), wherein it was held that its authority should be limited to the particular facts upon which the adjudication was made, and controlling importance was attached to the fact that the manufacturer in that case knew that his test was not to be the final test and that the purchaser was to make a further test, while here the appellant neither made a test nor was the duty imposed upon the purchaser by the contract of making one. If the appellant desired to raise any question with respect to the effect of the tests it should have made requests by which the jury would have been called upon to determine the material facts. Inasmuch as no such question was raised on the trial I am of opinion that the legitimate and only effect of the tests was their bearing upon the question as to whether or not the appellant properly performed its contract or, in other words, whether or not the appellant was guilty of negligence. It is too late now to contend that the tests were made by the purchaser and that they were satisfactory to it, and that it accepted the work as having been properly performed. Moreover, the evidence showed and the jury found that the appellant negligently performed the work of repairing the boiler and having performed the work improperly it could not in any event be relieved of the consequences thereof without *a proper test* showing that notwithstanding its negligence the boiler was safe for the use intended. It cannot

be successfully contended as matter of law that this was demonstrated by the tests made. The appellant had notice by the result of the first test that its work had not been properly performed; and it might well have been found that the second test after it undertook to remedy the defective work was not a proper or sufficient test for, according to the testimony of appellant's representative, the boiler was not then subjected to the same test as that to which it was originally subjected, for he says the highest pressure was only 160 pounds per square inch. Furthermore, after the second test and before the accident there was evidence that the defect had not been fully remedied. All contentions with respect to improper operation of the boiler, and with respect to an excessive amount of oil having been permitted to enter it, and with respect to the insertion of meal in the water are answered by the finding of the jury that the repairs were negligently made by the appellant and that but for its negligence the boiler head would not have given way and the accident would not have happened. The finding of the jury that the repairs were negligently made is amply sustained by the evidence which satisfactorily shows that the appellant failed to perform its duty of installing the tubes in a good and workmanlike manner. The appellant is chargeable with notice of the fact that the tubes were not merely intended as conduits for heat, but that they were intended to support and sustain the boiler heads, and it failed to install them in such manner that they would afford proper support in that regard. The appellant was chargeable with knowledge of the dangers to those lawfully on the premises in the event that the boiler head gave way owing to its negligence in making the repairs. A steam boiler is inherently dangerous and one who repairs it owes a duty of proper care to avoid injury not only to the property and employees of the purchaser but to all persons who may be thereby subjected to injury, and to that end must perform his work properly.

It follows that the judgment and order should be affirmed, with costs.

CLARKE, P. J., SCOTT, DOWLING and SHEARN, JJ., concurred.

Judgment and order affirmed, with costs.